THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: March 20, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re Calphalon Corp.*

_____

Serial No. 86356713

_____

Adam S. Weiss, Polsinelli PC,
    for Calphalon Corp.

Michael P. Keating, Trademark Examining Attorney, Law Office 101,
    Ronald R. Sussman, Managing Attorney.

_____

Before Wolfson, Heasley, and Larkin,
    Administrative Trademark Judges.

Opinion by Larkin, Administrative Trademark Judge:

Calphalon Corp. ("Applicant") seeks registration on the Principal Register of the

proposed mark SHARPIN, in standard characters,[1] for goods identified as "cutlery

---

[1] Applicant amended the drawing of the claimed mark during prosecution to render it as SharpIN, but for the reasons discussed below, we find that the amendment did not change the nature of the mark from a standard character mark to a special form mark. *See In re Star Belly Stitcher, Inc.*, 107 USPQ2d 2059, n.1 (TTAB 2013). Our presentation of the mark in all uppercase letters reflects the fact that a term registered as a mark in "standard character" form is not limited to any particular font style, size, or color.

knife blocks which incorporate built-in sharpeners that automatically sharpen knives," in International Class 21.[2]

The Trademark Examining Attorney has refused registration under Section 2(e)(1) of the Trademark Act, 15 U.S.C. § 1052(e)(1), on the ground that Applicant's mark is merely descriptive of the goods identified in the application. When the Examining Attorney made the refusal final, Applicant timely appealed and requested reconsideration, which was denied. The case is fully briefed. We affirm the refusal to register.

## I. Prosecution History and Record on Appeal

Applicant initially applied to register SHARPIN in standard characters for "cutlery knife blocks and sheaths." On November 20, 2014, the Examining Attorney issued a first Office Action requesting clarification of Applicant's identification of goods and requiring Applicant to provide information about whether its goods incorporate, use, or feature devices or items that sharpen knives or other objects.

On May 19, 2015, Applicant responded to the Examining Attorney's information request with the statement that "[t]he goods incorporate built in ceramic sharpeners that automatically sharpen knives every time they are taken out or returned to their slots as demonstrated by the attached evidence," and amended its identification of goods to read "cutlery knife blocks which incorporate built-in sharpeners that

---

[2] Application Serial No. 86356713 was filed on August 4, 2014 under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), on the basis of Applicant's allegation of a *bona fide* intention to use the claimed mark in commerce. Applicant amended its application during prosecution to allege use of its mark and to seek registration under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a).

automatically sharpen knives." The "attached evidence" consisted of what appears to be a press release describing Applicant's new line of self-sharpening cutlery to be sold under the proposed mark, and photographs of the product. The first page of the press release and the photographs are reproduced below (highlighting supplied by Applicant):

Calphalon® Launches Self-Sharpening Cutlery Featuring SharpIN™ Technology          Page 1 of 2

## Calphalon® Launches Self-Sharpening Cutlery Featuring SharpIN™ Technology

**In-Block Ceramic Sharpeners** Automatically Sharpen So Knives Stay Sharp for a Lifetime

Read More

"Calphalon Self-Sharpening Cutlery gives home cooks great cutting results time after time," said Justin Bluth, Director of Brand Marketing for Calphalon. "Sharp knives cleanly and neatly slice through food, making perfect cuts and helping you finish quickly, safely and effortlessly. With SharpIN™ technology, home cooks will never have to worry about how to sharpen their knives correctly, or how often."

Calphalon Self-Sharpening Cutlery is available in a variety of product lines, including the Classic, Contemporary and Precision. The Classic line is made from high-carbon, no-stain forged steel, while both the Contemporary and Precision lines are made from high-carbon, fully-forged German Steel. Each knife is conveniently labeled on the end of the handle for easy identification in the block. Prices range from $129.99 to $299.99 for full sets. All Calphalon cutlery sets featuring SharpIN™ technology come with a Full Lifetime Warranty.

Calphalon Self-Sharpening Cutlery featuring SharpIN™ Technology will be available at major kitchen retailers including Bed, Bath & Beyond, Macy's, and Belk beginning in May 2015, and JC Penney and Kohl's, in July 2015. Consumers can also purchase the cutlery sets on **Calphalon.com**.

For more information on Calphalon Self-Sharpening Cutlery or other Calphalon products, visit **www.calphalon.com** or visit brand social media sites at **facebook.com/Calphalon** and **twitter.com/Calphalon**.

About Calphalon
Calphalon is a leading manufacturer of professional quality cookware, cutlery, bakeware, and accessories for the home cook. Based in Atlanta, Calphalon is a part of Newell-Rubbermaid's global portfolio.





On June 3, 2015, the Examining Attorney issued a second Office Action in which he refused registration under Section 2(e)(1) of the Trademark Act, 15 U.S.C. § 1052(e)(1), on the ground that Applicant's proposed mark was merely descriptive of the goods as amended. The Examining Attorney made of record a definition of the word "sharpen" from *The American Heritage Dictionary* (www.ahdictionary.com) as "to make or become sharp or sharper."

Applicant responded to the second Office Action on December 2, 2015 and simultaneously filed an Amendment to Allege Use of its mark under Section 1(c) of the Trademark Act, 15 U.S.C. § 1051(c), supported by a specimen of use consisting of a photograph of product packaging bearing the mark:



In the response, Applicant argued against the refusal of registration and made of record Registration No. 4670617 of XTRABAKE for paper sheets and liners used for non-stick baking and wrapping and packaging of food products, namely, silicone coated paper, and Registration No. 4862448 of RAZORLITE for electric sharpeners for cutting instruments, namely, knives, scissors, wing wheel blades, wing breakers, and straight blades. Applicant did not discuss the registrations in its briefs on appeal, however, and we find that they are not relevant to the issues on appeal.

On December 18, 2015, the Patent and Trademark Office accepted Applicant's Amendment to Allege Use and on December 22, 2015, the Examining Attorney issued a third Office Action making final the refusal of registration under Section 2(e)(1) of the Trademark Act. The Examining Attorney made of record portions of Applicant's website at store.calphalon.com:







On June 22, 2016, Applicant filed a Notice of Appeal and simultaneously requested reconsideration and amendment of the drawing of its mark from SHARPIN to SharpIN supported by a photograph of its packaging (reproduced below):



On July 11, 2016, the Examining Attorney accepted Applicant's amendment to the drawing of its mark, but denied Applicant's request for reconsideration of the final refusal. The Examining Attorney also made of record additional definitions of the word "sharpen" from *Webster's New World College Dictionary* and *Random House Dictionary* as "to make or become sharp or sharper,"[3] and pages from the websites at

---

[3] These definitions are found at yourdictionary.com and dictionary.infoplease.com.

amazon.com and bakepedia.com that show, describe, or review Applicant's cutlery knife blocks. Portions of these webpages are reproduced below:

## Calphalon Classic Self-Sharpening Cutlery Knife Block Set with SharpIN Technology, 12 Piece

by Calphalon

★★★★☆ ▾   34 customer reviews  |  12 answered questions

Price: $149.99 & FREE Shipping. Details

Only 9 left in stock (more on the way).

Want it Wednesday, July 13? Order within **23 hrs 13 mins** and choose **One-Day Shipping** at checkout. Details

Ships from and sold by Amazon.com. Gift-wrap available.

Size: **12-pc**

| 6-pc | 12-pc |
|------|-------|
| $129.99 | **$149.99** |

- Cutlery set includes 8-inch Chef's Knife, 6-inch Serrated Utility Knife, 5-inch Santoku, 4.5-inch Parer, 6 Steak Knives, Kitchen Shears and Sharpening Knife Block
- Built-in ceramic sharpeners automatically sharpen straight edge knives with every use
- Constructed from forged, high-carbon, no-stain steel; full tang design for strength and balance
- Triple-riveted handles are contoured for a secure grip and labeled for easy identification in the block
- Covered by a Full Lifetime Warranty

15 new from $149.99    1 used from $134.99

(amazon.com).



### Knives Stay Sharp for a Lifetime with Calphalon SharpIN Technology

Properly sharpened knives make food prep faster and easier, giving you clean and precise cuts no matter what you're chopping, slicing or dicing. The Calphalon Classic Self-Sharpening 12 piece Cutlery Set features a knife block with in-slot sharpeners designed to sharpen knives every time you use them.

- Ceramic sharpeners are built right into the block
- Automatically sharpen straight edge knives with every use
- Works every time knives are removed from or placed in the block

View larger

## Calphalon

**About Calphalon**
Founded in 1963 in Toledo, Ohio, Calphalon got its start selling premium cookware to restaurants and commercial kitchens. As its culinary reputation grew, Calphalon expanded and became one of the first manufacturers to bring durable, professional-quality cookware to the retail market. Today, Calphalon continues to innovate and inspire, creating quality hard-anodized aluminum, stainless steel, nonstick and cast iron cookware as well as cutlery, bakeware, utensils and gadgets that enable home cooks to create delicious meals and share lasting memories.



**Easier Slicing**
SharpIN Technology keeps knives sharp for easier cutting, chopping, slicing and dicing

(amazon.com).

# Review of Calphalon Classic Self-Sharpening 12-pc. Cutlery Set with SharpIN Technology

POSTED BY: Dede Wilson
June 10, 2015

Tweet    **Pin it** New Self-Sharpening Knives from Calphalon



**Product Description:** From the manufacturer: "Knives stay sharp for a lifetime with Calphalon Classic Self-Sharpening Cutlery featuring SharpIN™ Technology. Sharpeners are built right into the block, automatically sharpening straight edge knives every time you remove them from the block to ensure peak sharpness at the start of every cutting task. Knives are made from high-carbon, no-stain forged steel, and feature full tang construction and a comfortably balanced, triple-riveted handle. In addition, knife handles are labeled so you can always pull the correct knife out of the block. The **Calphalon Classic SharpIN™ Forged 12-pc. Cutlery Set** includes a great selection of essential knives for dicing, chopping and more, plus six steak knives, too. Built-in ceramic sharpeners automatically sharpen knives with every use. Forged, high-carbon, no-stain steel. (Steak knives made from stamped steel). Full Lifetime Warranty. Full tang design for strength and balance. Labeled handles for easy identification in the block. Triple-riveted handles are contoured for a secure grip."



In order for the sharpening feature to work you need to draw the knives out of their slots by pulling them out and angling down at the same time. **The sharpener is at the base of the slot (as seen above)**, so if you remove the knife from the slot with an upward angle, then the knife won't contact the sharpener. Once we realized this, it was very easy to withdraw the knives correctly every time.

We used the knives pretty much daily over a 2-month period. We sliced strawberries, cored apples, pears and pineapples, chopped herbs for savory baking, chopped chocolate, minced nuts, chopped dried fruit, prepped carrots and zucchini, sliced cheese and used them every and any way we could. The knives kept a nice sharp edge and we are impressed.

**Pros:** The set offers a good array of knife sizes and styles. The edges definitely keep an edge. If you are not adept at sharpening knives and have found yourself using dull knives in the past (very dangerous, we might add) because you just couldn't get it together to sharpen them, this is the perfect solution. For the price this is a great purchase – and perfect for a gift.

**Cons:** The block takes up counter space. If you are short on space, that's an issue (although that's quite a few knives in the small square of real estate it takes up). We would have liked a shorter paring knife. If you are an ace knife sharpener and have a wet stone and know how to use it, these knives might not stay or be sharp enough for you.

(bakepedia.com).

## II. Mere Descriptiveness Refusal

The issue on appeal is whether Applicant's mark, as applied to the identified goods, is "merely descriptive" within the meaning of Section 2(e)(1) of the Trademark Act. As noted above, Applicant's Request for Reconsideration sought amendment of the drawing of the proposed mark from SHARPIN to SharpIN. The Examining Attorney accepted the amendment, but still treated the mark as SHARPIN, in standard characters, throughout his appeal brief. Applicant argues in its reply brief that the Examining Attorney erred by not entering the mark amendment as a "special

form" mark. 11 TTABVUE 5. As a result, Applicant argues, the Examining Attorney improperly argued on appeal that "SharpIN is in standard characters and thus is the equivalent to SHARPIN." 11 TTABVUE 5. Hence, we must initially determine whether Applicant's proposed mark should be treated as the special form mark "SharpIN," *i.e.*, as limited to this particular combination of upper and lower case letters, or as the standard character mark "SHARPIN," *i.e.*, without regard to font style, size, or color. *See* Trademark Rule 2.52(a).

## A. The Mark is a Standard Character, Not Special Form, Mark

Applicant amended the drawing of its proposed mark in its Request for Reconsideration. Applicant states in its reply brief that it "contacted the Examining Attorney before filing its Request for Reconsideration and discussed the amendment of the mark to SharpIN from SHARPIN." 11 TTABVUE 6. Applicant maintains that it summarized the discussion with the Examining Attorney in its Request for Reconsideration. 11 TTABVUE 6.[4] Applicant argues that despite discussing and approving the amendment, the Examining Attorney disregarded it on appeal, 11 TTABVUE 6, and that "[a]t the very least, it was incumbent upon the Examining Attorney to seek clarification from the Applicant of its intention to amend to the special form of SharpIN." 11 TTABVUE 6-7.

---

[4] The summary reads as follows: "Further to discussions with the Examining Attorney, as an initial matter, Applicant has made a non-material amendment to the Mark so that it more clearly reads 'SharpIN.' This amendment helps to show the manner in which Applicant is using the mark and more accurately reflects the emphasis, contrast, and juxtaposition of the 'Sharp' and 'IN' portions of the Mark. Applicant submits that such an amendment is proper in that it is not a material alter[]ation of the mark and will not necessitate a re-searching of the Mark. Applicant discussed the matter with the Examining Attorney and understands that he agrees that such an amendment is proper and acceptable." 4 TTABVUE 1.

Applicant cites Section 807.03(h) of the Trademark Manual of Examining Procedure ("TMEP") (January 2017) for the proposition that "the Examining Attorney must contact the Applicant if the record is unclear whether the submitted drawing was intended to be a standard character drawing." 11 TTABVUE 5-6.[5] Applicant also cites Section 807.03(c) of the TMEP, which provides, in pertinent part, that if an "application contains a standard character claim, but the mark includes a design element, color, or a claim of a particular style or size of lettering, or other elements such that the mark does not meet the requirements of 37 C.F.R. § 2.52, then the examining attorney must: (1) treat the drawing as a special form drawing; (2) require that the applicant delete the standard character claim from the record; (3) ensure that the appropriate drawing code is entered into the Trademark database; and (4) if appropriate, add design search codes." 11 TTABVUE 6.

We find that the record is not "unclear," within the meaning of TMEP § 807.03(h), as to whether the submitted drawing was intended to be a standard character drawing. We further find that Applicant's amendment to the drawing of its mark met the requirements of 37 C.F.R. § 2.52(a), and that the Examining Attorney was not required to treat the mark as being in special form. Trademark Rule 2.52(a), to which the cited TMEP section refers, sets forth the following requirements for a standard character drawing:

---

[5] Section 807.03(h) of the TMEP provides the following example of when such an inquiry should be made in an application under Section 1 of the Trademark Act: "[C]larification is needed if the font style used in the mark on the drawing does not match the font style used on the specimen and there is no standard character claim in the application, or if the applicant files a paper application in which the mark is printed or written by hand."

(1) The application includes a statement that the mark is in standard characters and no claim is made to any particular font style, size, or color; (2) the mark does not include a design element; (3) all letters and words in the mark are depicted in Latin characters; (4) all numerals in the mark are depicted in Roman or Arabic numerals; and (5) the mark includes only common punctuation or diacritical marks.

The final rulemaking in which the former term "typed" was replaced with the term "standard character" in Rule 2.52 explains that "[a] standard character drawing does not have to display the mark in all upper case letters, but may display the mark in any font style." Rules of Practice for Trademark-Related Filings Under the Madrid Protocol Implementation Act, 68 Fed. Reg. 55748, 55755 (September 26, 2003). However, regardless of the font style in which the mark is displayed, the United States Patent and Trademark Office utilizes a standardized typeface for printing a mark (filed either on paper or via TEAS) in the *Official Gazette* and on the registration certificate:

If the applicant files an application on paper that includes a standard character claim, the applicant may depict the mark in any font style; may use bold or italicized letters; and may use both uppercase and lowercase letters, all uppercase letters, or all lowercase letters, since no claim is made to any *particular* font style, size, or color. However, the USPTO will convert applicant's depiction of the mark to a standardized typeface for printing in the *Official Gazette* and on the registration certificate. If filing electronically via the Trademark Electronic Application System ("TEAS"), the applicant may neither depict the mark in any particular font style nor use bold or italicized letters. TEAS will automatically convert any wording typed into the standard-character field to a standardized typeface.

TMEP Section 807.03(a). (Emphasis in original). Applicant's amended drawing met the requirements of Rule 2.52(a) for a standard character drawing because the letters in its mark continued to be depicted in Latin characters, and the uppercase and lowercase letters in the drawing are part of the "standard character set that lists letters, numerals, punctuation marks, and diacritical marks that may be used in a standard character drawing." TMEP § 807.03(b).

Moreover, when Applicant requested amendment of the drawing through the United States Patent and Trademark Office's TEAS system, Applicant did not select the special form option and the standard character designation remained the designation of choice: "The mark consists of standard characters, without any claim to any particular font style, size or color." 4 TTABVUE 1. Because Applicant did not alter its original "standard character" designation and did not choose the special form option that would have limited its rights to a "particular font style, size, or color," and because the applicable requirements for a standard character drawing set forth in Trademark Rule 2.52 were otherwise satisfied, the Examining Attorney had no reason to inquire "whether the submitted drawing was intended to be a standard character drawing," TMEP § 807.03(h), and properly treated the mark in the amended drawing as a standard character mark. *See Star Belly Stitcher,* 107 USPQ2d at 2059, n.1 (applied-for mark displayed with uppercase and lowercase letters treated as standard form mark in all uppercase letters). In short, both Applicant's original and amended drawing met the requirements for a standard character drawing.

Applicant argues more broadly that its "amendment of the mark and argument presented in the Request for Reconsideration compels amendment to special form." 11 TTABVUE 7 (citing TMEP § 807.04(b) and decisions referred to therein). We disagree. The drawing of the mark, as amended, is still in an acceptable form for an application with a standard character claim. The use of mixed uppercase and lowercase letters is not inconsistent with such a claim and does not require deletion of Applicant's standard character claim in favor of a special form claim. When Applicant amended its drawing, it claimed that it was requesting "a non-material amendment to the Mark," one that was "not a material alter[]ation of the mark and will not necessitate a re-searching of the Mark." 4 TTABVUE 1. Implicit in the Examining Attorney's acceptance of Applicant's claim that SharpIN was not a "material alteration" of SHARPIN was the conclusion that the amended mark "contain[ed] what is the essence of the original mark" and "create[d] the impression of being essentially the same mark." TMEP § 807.14 (citing *In re Halcot-Colombier*, 105 F.3d 616, 41 USPQ2d 1523, 1526 (Fed. Cir. 1997)). While Applicant could have elected to amend the drawing of its mark to claim it only in a special form, the amended drawing does not compel such characterization, which was a matter within the choice of Applicant.

Applicant invites the Board to consider a remand of the application to the Examining Attorney "for clarification to special form," although it states that it "believes that a remand is unnecessary," 11 TTABVUE 7, n.3, and, notably, Applicant has not actually requested a remand under Section 1209.04 of the Trademark Board

Manual of Procedure.[6] As discussed above, we find that there is nothing unclear about Applicant's express claim of a standard character mark. The Examining Attorney properly treated the mark in the amended drawing as a standard character mark when briefing the appeal. We thus find no basis in the record for a remand.

We also see no basis for a remand in Applicant's claim, stated in its reply brief, that it first learned of the Examining Attorney's treatment of SHARPIN as a standard character mark in the Examining Attorney's appeal brief. Applicant argues that the Office Action denying the Request for Reconsideration "mentions entry of the substitute drawing and 'novel spelling,' but fails to explain that [the Examining Attorney] was considering the amendment as 'standard character,'" and that the "Examining Attorney's decision to disregard the amendment only became clear in his Appeal Brief." 11 TTABVUE 6, n.2. Applicant's characterization of the Examining Attorney's treatment of the amendment is disingenuous. The Examining Attorney neither disregarded the amendment, since its entry was noted, nor made an independent or unilateral decision to treat the amended mark as a standard character mark, since it was Applicant who so characterized it when submitting the amendment. In the Office Action denying the Request for Reconsideration, the Examining Attorney stated that "[t]he substitute drawing has been accepted," but just a few lines later stated that Applicant "seeks registration of the mark SHARPIN

---

[6] We understand this to mean that Applicant invites us to remand *sua sponte* to allow the Examining Attorney to acknowledge that the mark, as depicted in the amended drawing, is in special form. The Board will remand an application *sua sponte* if, during an appeal, it appears to the Board "that an issue not previously raised may render the mark of the appellant unregistrable," circumstances not present here. *See* Trademark Rule 2.142(f)(1), 37 C.F.R. § 2.142(f)(1).

for cutlery knife blocks which incorporate built-in sharpeners that automatically sharpen knives." 5 TTABVUE 3. The Examining Attorney's treatment of the applied-for mark as SHARPIN, not SharpIN, following amendment of the drawing, was consistent with Applicant's maintenance of its claim to a standard character mark when it requested the amendment.

Applicant also points to the Examining Attorney's reference to the "novel spelling" of the amended mark in his statement that "the applied for mark is merely a novel spelling or an intentional misspelling of a descriptive term." 5 TTABVUE 3. That was a reference to Applicant's misspelling of the word "sharpen" in the proposed mark, not, as Applicant claims, a reference to the amended drawing of the proposed mark to render it as SharpIN. The Examining Attorney used exactly the same phrase "a novel spelling or an intentional misspelling" in the December 22, 2015 Office Action making final the refusal to register, before Applicant first raised the possibility of an amendment to the drawing of the mark.[7] Applicant cannot legitimately claim surprise about the treatment of its mark as a standard character mark, particularly at this late stage in the proceedings.

To summarize, Applicant could have sought registration of its proposed mark in a particular stylized form, both initially when it filed its application and on

---

[7] We also note that the prosecution history for the application in the TSDR public database includes a June 24, 2016 entry stating "Amendment and Mail Process Complete," which reflects the processing of Applicant's amended drawing. This entry identifies Applicant's amended mark as a "Standard Character Mark." In addition, the "Mark Information" for Applicant's mark in the Status portion of the TSDR public database continued to state "Standard Character Claim: Yes. The mark consists of standard characters without claim to any particular font style, size, or color."

amendment, but elected instead to seek registration of its proposed mark in standard characters. Having elected to seek registration of its proposed mark as a standard character mark, and having offered no persuasive justification for taking a contrary position for the first time in its reply brief on appeal, Applicant must have the descriptiveness of the mark assessed without limitation to any particular depiction of that term.[8] *Cf. In re Elbaum*, 211 USPQ 639, 641 (TTAB 1981) (applicant who sought registration of its mark CIRCUL+AID in a "typed drawing" (the previous term for a standard character mark), rather than in a special form drawing, could not argue on appeal of a Section 2(d) refusal that the + character in its mark "ha[d] any more significance in terms of size or format than one of the other nine typed characters."). We turn now to the issue of mere descriptiveness.

## B. The Mark is Merely Descriptive

Section 2(e)(1) of the Trademark Act prohibits registration on the Principal Register of "a mark which, (1) when used on or in connection with the goods of the applicant is merely descriptive . . . of them." 15 U.S.C. § 1052(e)(1). A term is "merely descriptive" within the meaning of § 2(e)(1) if it "immediately conveys knowledge of a quality, feature, function, or characteristic of the goods or services with which it is

---

[8] A standard character registration provides a registrant with the broadest form of coverage for the registered mark because such a registration gives the registrant rights in the mark in block letters as well as in "depictions of the standard character mark regardless of font style, size, or color." *Citigroup Inc. v. Capital City Bank Grp. Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1259 (Fed. Cir. 2011); *see also Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1847 (Fed. Cir. 2000) ("Registrations with typed drawings are not limited to any particular rendition of the mark and, in particular, are not limited to the mark as it is used in commerce."); *In re White Rock Distilleries Inc.*, 92 USPQ2d 1282, 1284 (TTAB 2009) ("rights associated with a word mark in standard character (or typed) form reside in the wording and not in any particular display of the word.").

used." *In re Chamber of Commerce of the U.S.*, 675 F.3d 1297, 102 USPQ2d 1217, 1219 (Fed. Cir. 2012) (quoting *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 82 USPQ2d 1828, 1831 (Fed. Cir. 2007)). A term need only describe a single feature or attribute of the goods to be descriptive. *Id.* (citing *In re Dial-A-Mattress Operating Corp.*, 240 F.3d 1341, 57 USPQ2d 1807 (Fed. Cir. 2001)).

Whether a mark is merely descriptive is determined in relation to the goods or services for which registration is sought, not in the abstract or on the basis of guesswork. *In re Abcor Dev. Corp.*, 588 F.2d 811, 200 USPQ 215, 217-18 (CCPA 1978); *In re Fat Boys Water Sports LLC*, 118 USPQ2d 1511, 1512 (TTAB 2016). "'The question is not whether someone presented with only the mark could guess what the goods or services are. Rather, the question is whether someone who knows what the goods and services are will understand the mark to convey information about them.'" *DuoProSS Meditech Corp. v. Inviro Med. Devices, Ltd.,* 695 F.3d 1247, 103 USPQ2d 1753, 1757 (Fed. Cir. 2012) (quoting *In re Tower Tech Inc.*, 64 USPQ2d 1314, 1316-17 (TTAB 2002)); *see also In re Taylor & Francis [Publishers] Inc.*, 55 USPQ2d 1213, 1215 (TTAB 2000) (words PSYCHOLOGY PRESS in composite word-and-design mark were properly required to be disclaimed as merely descriptive of applicant's goods because applicant's identification of goods "expressly states that the series of non-fiction books upon which applicant uses its mark are 'in the field of psychology.'").

The Examining Attorney argues that consumers would perceive the mark SHARPIN as the equivalent of the word "sharpen" because the two words are spelled almost identically and are phonetic equivalents; that the word "sharpen" is defined

in the dictionary entries of record as "to make or become sharp or sharper;" and that Applicant's specimen and the webpages in the record indicate that a purpose or function of its goods, identified as "cutlery knife blocks which incorporate built-in sharpeners that automatically sharpen knives," is the sharpening of knives, causing SHARPIN to "immediately indicate the function and purpose of the goods, *i.e.* to sharpen," and rendering it merely descriptive of the goods. 10 TTABVUE 6-7.

The Examining Attorney argues that SHARPIN is not suggestive because "[c]onsumers will immediately and directly know the function and purpose of the goods and do not need to engage in multi-stage reasoning to reach this conclusion." 10 TTABVUE 7. According to the Examining Attorney, "[f]aced with the term SHARPIN and knowing that the goods are knife blocks featuring built-in sharpeners designed to sharpen knives, the relevant consumer will immediately know the meaning of the mark and will not need to engage in mental gymnastics to reach that conclusion. Again, the meaning is clear and direct." 10 TTABVUE 8. In response to Applicant's claim, discussed below, that SHARPIN is a "double entendre," the Examining Attorney argues that the "mark does not have a double connotation or multiple meanings at all—rather, the mark immediately, clearly and directly states the function and purpose of the goods." 10 TTABVUE 9.

Applicant offers a number of arguments, discussed below, for why its proposed mark is suggestive and not merely descriptive. Applicant summarizes the test for distinguishing suggestive marks from merely descriptive terms as follows:

> Various tests have been devised to determine whether a
> mark is suggestive or descriptive. Many courts, and the

> TTAB, use the "imagination" test, under which a mark is suggestive if it requires some imagination, thought and perception to reach a conclusion as to the nature of the goods or services. Conversely, a mark is descriptive if it immediately conveys to one seeing or hearing the mark the thought of the Applicant's goods or services.

8 TTABVUE 10 (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 189 USPQ 759 (2d Cir. 1976), *Bell South Corp. v. Planum Tech. Corp.*, 14 USPQ2d 1555, 1556 (TTAB 1988), and *Abcor*, 200 USPQ at 218.

Applicant argues that imagination is required to determine the nature of the product and "that the Mark, especially as amended, does not immediately convey a readily understood meaning to the average purchaser as to the nature of Applicant's goods." 8 TTABVUE 10. Applicant further argues that SHARPIN is an incongruous mark, 8 TTABVUE 12-13, and a double entendre. 8 TTABVUE 14-17.

Applicant argues that its mark is incongruous because "Applicant has created a new word—SharpIN—of incongruous meaning that consumers must interpret to understand." Applicant argues that its mark is a double entendre because "the Mark has multiple suggestive meanings that form puns and double ent[]endres–and not theoretical, as it is precisely the manner in which Applicant actually uses its mark and promotes such unique commercial impression–and has an incongruous meaning." 8 TTABVUE 15. Applicant posits the following "multiple suggestive meanings" of its mark:

> For example, the goods could contain a knife sharpener like other knife blocks. The goods may not pertain to "knives" at all, but instead pertain to some other "sharp" product. The goods could also sharpen knives. The goods could also contain a *built in* knife sharpener that would sharpen knives when placed *inside* the block. The use of the term

> could also be a warning such that something is sharp in the product and to take heed. Or the Mark could suggest that the user is "sharp" (i.e., intelligent and keen) for placing a knife "in" the cutlery block. However consumers will view the term, they certainly will not immediately believe that SharpIN refers to a cutlery block.

8 TTABVUE 15 (emphasis in original). In Applicant's reply brief, Applicant claims more specifically that its mark "has a clear double meaning" inhering in the fact that "[c]onsumers will understand the mark to refer both to sharpening knives and that a sharpener is built within the knife block." 11 TTABVUE 9.

Applicant concludes by arguing that the evidence of record is insufficient to show mere descriptiveness because it shows "Applicant's proprietary use of the mark," 8 TTABVUE 17, and there is no dictionary definition of "sharpin" or "SharpIN." 8 TTABVUE 18. Applicant also argues that "there is no evidence of record that brand owners use 'SHARPIN' or 'SHARPEN' to describe similar goods," 8 TTABVUE 12, and that "Applicant's mark is not in any manner used by competitors to describe their products and would not preclude competitors from accurately describing their products in the future." 8 TTABVUE 13.

Applicant's statement of the law of descriptiveness reflects a fundamental misunderstanding. In arguing that a mark is merely descriptive "if it immediately conveys to one seeing or hearing the mark *the thought of the Applicant's goods or services*," 8 TTABVUE 10 (emphasis added), and that SHARPIN is not merely descriptive because it "does not immediately convey *a readily understood meaning to the average purchaser as to the nature of Applicant's goods*," 8 TTABVUE 10

(emphasis added), Applicant misstates the test for descriptiveness.[9] As discussed above, the "question is not whether someone presented with only the mark could guess what the goods or services are. Rather, the question is whether someone who knows what the goods and services are will understand the mark to convey information about them." *DuoProSS*, 103 USPQ2d at 1757. Applicant's misstatement of the test for descriptiveness causes Applicant to focus improperly upon whether a purchaser would understand its mark to refer to a type of product, 8 TTABVUE 10-12,[10] rather than whether a purchaser who knows that the goods are "cutlery knife blocks which incorporate built-in sharpeners that automatically sharpen knives" would understand SHARPIN "to convey information about them." *Id*.

Applicant's argument that it has "created a new word—SharpIN—of incongruous meaning that consumers must interpret to understand," 8 TTABVUE 13, is unavailing. As discussed above, Applicant does not seek registration of its mark in

---

[9] The Board's 1988 *Bell South* case cited by Applicant in its discussion of the test for descriptiveness, 8 TTABVUE 10, held that PHONE FORWARD for automatic telephone call diverters was not merely descriptive "because the meaning conveyed by applicant's mark is not immediate and direct and because there is no evidence of actual use by competitors or a need to use these words . . ." 14 USPQ2d at 1556. We have since disavowed any requirement that the examining attorney show use by third parties to prove descriptiveness (or the position that the lack of third-party use disproves descriptiveness) in light of the Federal Circuit's subsequent decisions in *Gyulay*, *Chamber of Commerce*, and *DuoProSS. See Fat Boys*, 118 USPQ2d at 1514 (citing cases). *See also KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 122 (2004) (trademark law does not countenance someone obtaining "a complete monopoly on use of a descriptive term simply by grabbing it first") (citation omitted).

[10] Applicant claims, for example, that "consumers seeking to buy a cutlery block would never ask for a 'sharpen' and would never know what a 'sharpen' was if advertised in a store;" 8 TTABVUE 10; that "it would take a substantial leap for a consumer to get from the word 'SharpIN' (or the word 'sharpen' for that matter) to a knife cutlery block containing an internal sharpening mechanism;" 8 TTABVUE 11; and that a "cutlery knife block is not, in itself, a 'sharpin' or 'sharpen;'" 8 TTABVUE 12.

special form, and we must assess whether the standard character mark SHARPIN is incongruous as applied to "cutlery knife blocks which incorporate built-in sharpeners that automatically sharpen knives." For purposes of Section 2(e)(1), incongruity exists, for example, where a term evokes an immediate association with something unrelated to the goods or services. *See, e.g., In re Tennis in the Round, Inc.*, 199 USPQ 496 (TTAB 1978). In *Tennis in the Round*, the Board held that the mark TENNIS IN THE ROUND was not merely descriptive of the services of providing tennis facilities in the form of courts and tennis ball machines and offering instruction in tennis. The Board found that the mark immediately evoked an association with the well-known phrase "theater in the round" (in which the audience sits on all sides of a central acting stage), but was incongruous with that association because the applicant's "tennis facilities are not in fact at all analogous to those used in a 'theater-in-the-round;' that is, applicant's facilities do not involve a tennis court in the middle of an auditorium (or in the middle of an arrangement of stands) with an audience seated on all sides of the court." 199 USPQ at 498. *See also In re Shutts*, 217 USPQ 363, 364 (TTAB 1983) ("SNO-RAKE" for a snow removal hand tool not merely descriptive because while it evoked raking snow, "the idea of a 'rake' or 'raking' does indeed sit strange in terms of application to snow and, at best, is suggestive of a capacity for gathering up snow with an implement or using an action that hardly fits any of the common conceptions of 'rake' or 'raking.'"); *Borden, Inc. v. Topps Chewing Gum, Inc.*, 173 USPQ 447, 447 (TTAB 1972) (finding the mark ICE CREAM incongruous, and thus registrable, for chewing gum).

We find that SHARPIN evokes an immediate association with the phonetically-identical and otherwise virtually-identical word "sharpen," and there is nothing incongruous about the use of the word sharpen (or its phonetic equivalent SHARPIN) to describe the function of goods identified as "cutlery knife blocks which incorporate built-in sharpeners that automatically sharpen knives."

With respect to Applicant's double entendre argument, Applicant's main brief first quotes the definition of a double entendre from TMEP Section 1213.05(c), namely, "'an expression that has a double connotation or significance as applied to the goods or services,'" 8 TTABVUE 14, and then offers several different connotations of the mark. 8 TTABVUE 15. In its reply brief, Applicant pares the list down to two: "Applicant's mark SharpIN, when used in conjunction with 'cutlery blocks,' has a clear double meaning when presented. Consumers will understand the mark to refer both to sharpening knives and that a sharpener is built within the knife block." 11 TTABVUE 9. Applicant apparently contends that the second proposed meaning is not descriptive.

"The multiple interpretations that mark an expression a 'double entendre' must be associations that the public would make fairly readily, and *must be readily apparent from the mark itself*." *Id*. (emphasis in original) (citations omitted). *See, e.g., In re Tea & Sympathy Inc.*, 88 USPQ2d 1062, 1064 (TTAB 2008) (the mark THE FARMACY for retail store services featuring natural herbs and organic products and for providing integrated health services at retail locations and information about dietary supplements and nutrition was a double entendre because it was "a play on

the natural or farm-fresh characteristics of applicant's herbs and organic products used for medicinal purposes featured in applicant's services" that conveyed "a dual meaning, that of the natural aspect of the goods sold by applicant and of a pharmacy."); *In re Nat'l Tea Co.*, 144 USPQ 286 (TTAB 1965) (NO BONES ABOUT IT found to be a double entendre when used for boneless ham); *In re Delaware Punch Co.*, 186 USPQ 63 (TTAB 1975) (THE SOFT PUNCH found to be a double entendre when used for noncarbonated soft drinks); *Colonial Stores Inc.*, 394 F.2d 549, 157 USPQ 382, 384-85 (CCPA 1968) (SUGAR & SPICE not merely descriptive of bakery products, notwithstanding the descriptive nature of the terms "SUGAR" and "SPICE," because it immediately evoked the nursery rhyme "sugar and spice and everything nice").

We find that Applicant's first proposed meaning of SHARPIN—that the mark refers to "sharpening knives"—is the only readily-apparent meaning conveyed by the mark in standard character format, and we further find that this meaning is merely descriptive because it immediately describes a key function of the goods, namely, that they sharpen knives. Applicant's mark is not a double entendre because Applicant's briefs make it clear that the possible existence of Applicant's second proposed meaning of SHARPIN—that "a sharpener is built within the knife block"—inheres in the presentation of the mark in a special form as SharpIN, and that is not the form of the mark for which Applicant seeks registration.

In Applicant's reply brief, Applicant argues that its "amended mark is not SHARPIN," that its main brief "is replete with arguments related to the unique and

distinctive presentation of SharpIN,"[11] and that "[n]owhere in the Examining Attorney's response is the unique presentation of SharpIN even addressed." 11 TTABVUE 8. Applicant claims that the Examining Attorney "misaddresses Applicant's double entendre argument by maintaining his position that the mark 'is in standard characters and spelled in almost identical fashion to the descriptive term SHARPEN, and is the clear phonetic equivalent of that term,'" and that the Examining Attorney "completely disregards the fact that Applicant's goods are cutlery blocks that contain a built-in sharpener and that *the mark SharpIN creates a double entendre capable of distinction.*" 11 TTABVUE 8 (emphasis added).

Applicant distinguishes a decision cited by the Examining Attorney for the proposition that a double entendre must be well recognized by the public, *In re Ethnic Home Lifestyles Corp.*, 70 USPQ2d 1156 (TTAB 2003), on the ground that "Applicant's mark SharpIN, when used in conjunction with 'cutlery blocks,' has a clear double meaning when presented." 11 TTABVUE 9. According to Applicant, the "Examining Attorney's failure is also highlighted by his mere conclusion that consumers would perceive SHARPIN as SHARPEN. . . . *This conclusion entirely misses the point of the amendment, which makes the suggested pronunciation even more clear, namely the inflection between 'Sharp' and 'IN.' The mark SharpIN does not have the same pronunciation nor is it simply a mere misspelling of SHARPEN when presented as amended.*" 11 TTABVUE 9-10 (emphasis added).

---

[11] Applicant's double entendre argument in its opening brief focuses solely on the depiction of the mark as SharpIN in special form and does not address whether its standard character mark SHARPIN is a double entendre. 8 TTABVUE 14-17.

The special form mark SharpIN that Applicant claims has a second, non-descriptive meaning, and that Applicant claims makes the mark a double entendre, is not before us. The mark that is before us, SHARPIN in standard character form, does not readily evoke the alternative meaning claimed by Applicant, in the manner in which marks such as SUGAR & SPICE and NO BONES ABOUT IT readily evoked associations with familiar matter from the American English vernacular, and is thus not a double entendre.

We agree with the Examining Attorney that the evidence of record establishes that Applicant's claimed mark SHARPIN is merely descriptive of the identified goods. The proposed standard character mark SHARPIN is the phonetic equivalent of the word "sharpen," which the record shows means "to make or become sharp or sharper." The specimen, webpages and packaging in the record show, as Applicant acknowledges, that a key function of its goods is to make knives sharp or sharper. As the Examining Attorney states, "the relevant consumer will immediately know the meaning of the mark and will not need to engage in mental gymnastics to reach that conclusion [because] the meaning is clear and direct." 10 TTABVUE 7. We have no doubt that a consumer who understands the relevant goods to be "cutlery knife blocks which incorporate built-in sharpeners that automatically sharpen knives" will understand the SHARPIN mark to convey information about them, *DuoProSS,* 103 USPQ2d at 1757, namely, that they sharpen knives.

**Decision**: The refusal to register is affirmed.